UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
FORT WAYNE DIVISION

| | |
|---|---|
| LUCAS K. WILLIAMS, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Cause No. 1:22-cv-00061-HAB |
| | ) |
| CITY OF FORT WAYNE and | ) |
| BOYCE J. BALLINGER, | ) |
| | ) |
| Defendants. | ) |

## **OPINION AND ORDER**

On July 25, 2024, a jury found that Defendant, Boyce Ballinger ("Ballinger"), violated Plaintiff Lucas Williams' ("Williams") Fourth Amendment rights by using excessive force and falsely arresting him. The jury awarded $80,000 in compensatory damages against Defendants Ballinger and the City of Fort Wayne ("City"). Ballinger and the City now ask the Court to remit the compensatory damage award or grant a new trial under Federal Rule of Civil Procedure 59.[1] For the following reasons, Defendants' Motion (ECF No. 93) will be GRANTED.[2]

### I.     Factual Background

Williams sued Ballinger and the City under theories of false arrest, under both state and federal law, and excessive force after Ballinger tackled Williams to the ground and arrested him on May 30, 2020. Over three days, Williams and Defendants presented evidence to the jury. The

---

[1] Williams, as the prevailing party, requests the right to supplement his Verified Petition for Attorneys' Fees and Costs (ECF No. 90) to include additional time required for post-trial motions in front of this Court. The Court will keep Williams' Petition (ECF No. 90) under advisement until Williams either accepts remittitur or the matter is set for a new trial.

[2] After the jury returned its verdict, Defendants requested the opportunity to brief the issue of qualified immunity with Defendants' brief to be filed by August 26, 2024. (ECF No. 83). No briefs have been filed and thus Defendants have waived their arguments on the issue of qualified immunity.

jury found Ballinger and the City liable, awarding Williams the following in compensatory damages: $20,000 for the state false arrest claim; $20,000 for the federal false arrest claim; and $40,000 for the excessive force claim. (ECF No. 86).

Williams testified on the second day of trial. (Trial Tr. Day 2, "Trial Tr. 2 at ___.") Although there was no video of Ballinger tackling Williams, it was Williams' testimony that while walking peacefully on the sidewalk he "was taken from behind, tackled to the ground, and [his] face hit the ground" without warning. (Trial Tr. 2 at 63-65). Williams claimed that his face broke his fall and—while mounting him and placing him in cuffs—Ballinger asked Williams, "can you fucking breath now?" (*Id.* at 67). Williams believed this to be in reference to the recent George Floyd incident. (*Id.* at 68).

Williams then testified that he was "in shock" as officers placed him into the back of the squad car. (*Id.*). Williams' counsel played a video Williams handcuffed in the back of the squad car after the incident. (Tr. Ex. 11). Williams has a wound on his forehead and is experiencing a bloody nose. (*Id.*). While in the back of the squad car, officers pursued another suspect with Williams still in the rear of the vehicle. (*Id.*) On the audio, you could hear Ballinger making threats to the fleeing suspect before officers exited their vehicles and "dog piled" the individual. (*Id.*) Williams watched as officers "[struck] the individual on the ground as [he was] crying for help." (Trial Tr. 2 at 71). Williams was then taken to jail where he was detained for 44 hours. (*Id.* at 72).

Before the jury, Williams discussed photographs taken after the incident. (Tr. Ex. 10). The photographs showed bruising to Williams' nose and face as well as permanent scarring on his forehead. (Trial Tr. 2 at 73-74). Williams discussed recurring headaches not present before the incident. (*Id.* at 74). And Williams testified that he visited a counselor for the emotional and mental trauma that he then-experienced and continued to experience to this day. (*Id.*). When discussing

2

how he was still dealing with these issues, Williams and his attorney engaged in the following dialogue:

> **[Williams].** I constantly have to be aware of everything around me to the point where I go out of my way even if it's uncomfortable to be in the know of who's around me, what's going on around me. Even with the field that I'm going into, seeing the red and blues on a—specifically a Fort Wayne cop car, I jump—my heart jumps. Different elements that are just consistent like they're continuing.
>
> **[Counsel].** Do you relate all of those experiences to the encounter you had with Sergeant Ballinger?
>
> **[Williams].** All of them.
>
> **[Counsel].** And did your unwilling involvement in that subsequent pursuit also add to those effects?
>
> **[Williams].** It did. I told you about those nightmares. I still have nightmares from time to time. They just -- they don't stop. They continue. They're still continuing, but it all stems from that night.

(Trial Tr. 2 at 74-75). Williams, a criminal justice major with dreams of becoming a law enforcement officer, also expressed his concern that this incident will affect his career goals. (*Id.* at 76-77).

Williams' counselor, Sherri Welch ("Welch"), also testified before the jury and discussed Williams' medical records. (*Id.* at 45; Tr. Ex. 19). Williams reported that he experienced nightmares—some of which mirrored the incident—and trouble sleeping. (Tr. Ex. 19). Williams reported a state of near-constant hypervigilance and cannot have people behind him for fear of being "attacked from behind like the day of the arrest." (*Id.*). And Welch discussed how this specific event made it such that Williams was unable see "a police uniform" or a "Fort Wayne P.D. cruiser" without being reminded of the incident. (Trial Tr. 2 at 48). The incident lived on in Williams' "dreams and his daily life and it was haunting." (*Id.*). In Welch's professional opinion,

3

these symptoms were consistent with Post Traumatic Stress Disorder ("PTSD") which Williams continues to experience until the present. (*Id.*).

During closing arguments, Williams' counsel told the jury that Williams was there "to get justice. And justice means asking you and trusting you together with your common sense, to find a verdict that fixes and makes up for the injury and harm [Williams] has had." (Trial Tr. 3 at 88). And he discussed the importance of Williams' case because claims like his "protect citizen's rights," "protect our right to walk down the street" or "attend a protest," and protect "our right to rely on the police." (*Id.*). Williams' counsel urged the jury to determine whether Williams had "a big important claim or…a small claim[.]" If a small claim, he suggested that the jury would not award more than $50,000. (*Id.* at 89). But, "if it's more important and more impactful, then you need to use your common sense" with Williams' counsel mentioning a figure of $300,000. And he suggested that the award should "be substantial because the injury was substantial. And the right that was violated was important." (*Id.*). There were no objections made during closing arguments.

## II. Rule 59 Standard

Rule 59 allows a party to move for a new trial or to alter or amend the judgement. Fed. R. Civ. P. 59. "A new trial is appropriate if the jury's verdict is against the manifest weight of the evidence or if the trial was in some way unfair to the moving party." *Venson v. Altamirano*, 749 F.3d 641, 656 (7th Cir. 2014). It is an "extraordinary remed[y] reserved for the exceptional case." *Childress v. Walker*, 787 F.3d 433, 442 (7th Cir. 2015) (citations omitted). Courts "uphold a jury verdict...as long as a reasonable basis exists in the record to support [the] verdict." *Id.* When considering a motion for a new trial, "the evidence must be viewed in the light most favorable to the prevailing party." *Carter v. Moore*, 165 F.3d 1071, 1079 (7th Cir. 1998).

Under Rule 59(e), a court may also "alter or amend a judgment[,]" which includes remittitur. Fed. R. Civ. P. 59(e); *Baier v. Rohr-Mont Motors, Inc.*, 175 F. Supp. 3d 1000, 1007 (N.D. Ill. 2016). On review, a court must give a jury's damage determination "substantial deference" but "must also ensure that the award is supported by competent evidence." *Ramsey v. Am. Air Filter Co.*, 772 F.2d 1303, 1313 (7th Cir. 1985). If an award is excessive, "it is the duty of the trial judge to require a remittitur or a new trial." *Linn v. United Plant Guard Workers*, 383 U.S. 53, 65-66, 86 S. Ct. 657, 15 L. Ed. 2d 582 (1966); *see also Baier*, 175 F. Supp. 3d at 1007 ("If the [c]ourt finds that damages are excessive, the proper remedy is remittitur"). Remittitur is appropriate for damage awards that are "monstrously excessive," bear no rational connection to the evidence, and are not "roughly comparable to awards made in similar cases." *Gracia v. Sigmatron Int'l, Inc.*, 842 F.3d 1010, 1022 (7th Cir. 2016).

The movant must show that "no rational jury could have rendered a verdict against them." *King v. Harrington*, 447 F.3d 531, 534 (7th Cir. 2006). Courts employ the same analysis for motions under Rule 59 as summary judgment, except that they "now know exactly what evidence the jury considered in reaching it verdict." *Harvey v. Office of Banks & Real Est.*, 377 F.3d 698, 707 (7th Cir. 2004). The Court must consider the evidence in the light most favorable to the prevailing party while leaving issues or credibility and weight to the jury. *Carter*, 165 F.3d at 1079.

### III.    Discussion

Defendant asks the Court to reduce the $80,000 compensatory damages award or hold a new trial on the associated issues. Defendants advance what is really three arguments for why the Court should reduce the award or, in the alternative, grant a new trial: (1) the lack of evidence about Williams' physical injuries and economic losses; (2) the jury's verdict was tainted by improper statements made by Williams' counsel during closing arguments; and (3) the $20,000

damage awards for wrongful arrest under state and federal law are duplicative. The Court will address each of Defendants' assertions in turn.

### a. Lack of Evidence

Defendants' arguments related to lack of evidence comes in three flavors. First, they argue that the there was no testimony about any economic losses and Williams' counseling sessions alone cannot support an $80,000 award. Second, Defendants contend that there was a lack of medical evidence and medical testimony on Williams' physical injuries that would support a $40,000 award on his excessive force claim. And lastly, they state that the general lack of monetary testimony supports a reduction. From Defendants' perspective, "[a]n $80,000 award for a tackle and two nights of incarceration exceeds any reasonable thought on compensatory damages." (ECF No. 94 at 8).

Williams responds that economic losses were not part of the damages equation here. (ECF No. 105 at 13). Indeed, the Court's jury instruction on damages—which the parties stipulated to—does not mention economic losses:

> If you find in favor of Plaintiff on one or more of Plaintiff's claims, then you must determine the amount of money that will fairly compensate Plaintiff for any injury that you find he sustained as a direct result of his false arrest and injuries from excessive force.
>
> Plaintiff must prove his damages by a preponderance of the evidence. Your award must be based on evidence and not speculation or guesswork. This does not mean, however, that compensatory damages are restricted to the actual loss of money; they include both the physical and mental aspects of injury, even if they are not easy to measure.
>
> You should consider the following types of compensatory damages, and no others:
>
> The physical, mental, and emotional pain and suffering that Plaintiff has experienced. No evidence of the dollar value of physical or mental and emotional pain and suffering has been or needs to be introduced. There is no exact standard for setting the damages to be awarded on account of these factors. You are to

> determine an amount that will fairly compensate the Plaintiff for the injuries he has sustained.

(ECF No. 85 at 22). Williams thus argues, consistent with this instruction, that damages are not limited to those supported by medical bills or lost wages. Williams' position is that his own testimony partnered with Welch's professional opinions support the verdict. The Court agrees and will not remit the compensatory damages award on this basis.

Three factors inform the Court's analysis as to whether a compensatory award exceeds rational limits: "whether the damages awarded (1) were monstrously excessive; (2) had no rational connection between the award and the evidence; and (3) were roughly comparable to awards made in similar cases." *EEOC v. AutoZone, Inc.*, 707 F.3d 824, 833 (7th Cir. 2013). "'A monstrously excessive verdict is one that is a product of passion and prejudice' and is essentially the same inquiry as factor two: was this verdict irrational?" *Stewardson v. Cass Cnty.,* 2023 WL 7183186, at *5 (N.D. Ind. Nov. 1, 2023) (quoting *Adams v. City of Chi.*, 798 F.3d 539, 543 (7th Cir. 2015)).

Relevant here, the Seventh Circuit has affirmed substantial compensatory damage awards in "cases that include even the slightest physical elements." *EEOC*, 707 F.3d at 834 (collecting cases). The inquiry is not whether the jury could have reached a lesser award; rather, it is whether the amount bears a rational connection to the evidence at trial. *Adams*, 798 F.3d at 543; *see also Hendrickson v. Cooper*, 589 F.3d 887, 893 (7th Cir. 2009) ("A different jury may have chosen a lower number, but this uncertainty is unavoidable when making different estimates of pain and suffering."). While comparisons to other cases matter, "such comparisons are rarely dispositive given the fact-specific nature of damages claims." *Hendrickson*, 589 F.3d at 892.

The jury watched Williams and Welch testify and believed that the evidence supported $80,000 in damages. *See G.G. v. Grindle*, 665 F.3d 795, 799 (7th Cir. 2011) ("Great deference

7

must be given to the jury's verdict, because...the jury [is] in a superior position to find facts and determine a proper damages award.") (quotations omitted). They heard Williams say that he was simply walking down the street when he "was taken from behind, tackled to the ground, and [his] face hit the ground." (Trial Tr. 2 at 63-65). Although the tackle was not caught on video, the video from moments after the tackle shows Williams in the back of a squad car with a wound on his forehead and a bloody nose. (Tr. Ex. 11). Photographs taken days after the incident showed bruising to Williams' nose and face as well as permanent scarring on his forehead. (Trial Tr. 2 at 73-74). Williams informed the jury of recurring headaches he began experiencing because of the tackle. (*Id.* at 74). He described being "terrified and shocked" as Ballinger placed Williams in the rear of the squad car. (*Id.* at 68). And Williams stated he was "very lightheaded" and "very dizzy" after the incident. (*Id.* at 73). *See Hendrickson*, 589 F.3d at 893 ("Given the uniquely subjective nature of pain," it is understandable for plaintiffs to rely on their own testimony for damages evidence.).

Williams also described a subsequent pursuit of another suspect while he was still in the back of the squad car. He heard Ballinger taunting the individual and threatening to beat the fleeing suspect. (Tr. Ex. 11). Williams then watched officers tackle the suspect and "strike the individual on the ground as [he was] crying for help." (Trial Tr. 2 at 71). Reliving those events made Williams feel "terrified" and he stated that a lot of his nightmares were recurring from the later pursuit. (*Id.* at 70). "[Those screams] would replay all the time in [his] dreams." *Id.*

Defendants posit that "[a]n award for nonpecuniary loss can be supported, in certain circumstances, solely by a plaintiff's testimony about his or her emotional distress." *Tullis v. Townley Engineering & Mfg. Co.*, 243 F.3d 1058, 1068 (7th Cir.2001). Based on this authority, they argue that "an award without economic losses should be the exception, not the common rule."

(ECF No. 94 at 5). But "[n]o expert testimony is required to assist jurors in determining the cause of injuries that are within their common experiences or observations." *Hendrickson*, 589 F.3d at 892. And Williams damages are supported by more than just his own testimony; Welch testified on Williams' behalf and confirmed the emotional toll that the events caused him. The jury instructions also properly state that "[n]o evidence of the dollar value of physical or mental and emotional pain and suffering has been or needs to be introduced." (ECF No. 85 at 22). *See also Stewardson,* 2023 WL 7183186, at *9 (citing *Chlopek v. Fed. Ins.*, 499 F.3d 692, 702 (7th Cir. 2007)) ("Courts presume that juries follow judicial instructions, and the defendants offer nothing to rebut that presumption here other than the complaint that the damages are high.").

Welch documented that Williams experienced nightmares—some of which mirrored the incident—and trouble sleeping. (Tr. Ex. 19). She also reported that Williams was in a state of near-constant hypervigilance and cannot have people behind him for fear of being "attacked from behind like the day of the arrest." (*Id.*). Indeed, she testified that the incident lived on in Williams' "dreams and his daily life and it was haunting." (Trial Tr. 2 at 48). And, in her professional opinion, Welch testified that Williams exhibited symptom of PTSD arising from his encounter with Ballinger. (*Id.*). Williams testified that he is still dealing with these issues today. (*Id.* at 74).

"The required 'rational connection' between the evidence and the award does not imply mathematical exactitude, especially where the compensatory damages are for pain and suffering. Such damages are very difficult to quantify, leaving it to the jury to select a dollar amount that it believes will fairly compensate the plaintiff." *Hendrickson,* 589 F.3d at 892-93 (citation omitted). Although a different jury might have reached a different conclusion, that is not the standard. And mathematical certainty is not required. Williams was tackled to the ground without provocation, his face smashed the pavement, and he was detained for 44 hours. His physical injuries were

apparent from both video and photographic evidence. His mental and emotional trauma were aptly supported by Williams' and Welch's testimony. Given the circumstances, the jury could reasonably conclude that $80,000 would fairly compensate Williams for his injuries.[3]

Lastly, the Court looks to the "comparable cases" provided by the parties. These comparisons "provide a reference point that assists the court in assessing reasonableness; they do not establish a range beyond which awards are necessarily excessive." *Farfaras v. Citizens Bank & Tr.*, 433 F.3d 558, 566 (7th Cir. 2006). Defendants come forward with three cases—all of which are distinguishable. *See Marion Cnty. Coroner's Office v. E.E.O.C.*, 612 F.3d 924, 931 (7th Cir. 2010) (reducing compensatory damages from $200,000 to $20,000); *Driggers v. Sanders*, No. 1:06-cv-1112 (C.D. Ill. March 5, 2009) (awarding $7,500 in compensatory damages); *Garza v. Shaffer*, 45D02-0809-CT-244 (Lake Super. Ct., Ind. Oct. 20, 2009) (awarding $12,500 in damages). In *Marion County,* the plaintiff claimed *solely* emotional distress damages arising from an employment discharge. 612 F.3d at 931. Unlike here, there was no physical component. *See EEOC*, 707 F.3d at 834. In *Driggers,* drunken member of a bachelor party got into a fight with police; they were not attacked without any provocation as Williams alleges. And in *Garza,* the plaintiff injured his wrists because his handcuffs were too tight.

Williams responds with cases that are more on point and with larger verdicts. *See Hendrickson,* 589 F.3d 887 (awarding $75,000 in compensatory damages on an excessive force claim); *Stewardson,* 2023 WL 7183186 (awarding $400,000 in compensatory damages on

---

[3] Defendants also argue that the damage award for Williams' excessive force claim is excessive because the jury awarded the same amount in damages for the wrongful arrest claims. (ECF No. 94 at 8). Defendants state that "the excessive force claim is essentially being tackled. In contrast, the wrongful arrest claims involve Williams' testimony of continued emotional distress and an inability to find a position as a law enforcement officer." (*Id.*). Williams' emotional harms stemmed from both Ballinger's use of excessive force and the subsequent wrongful arrest. This was an on-going event and the Court declines Defendants' request to arbitrarily assign the emotional harms to each claim when the facts demonstrate a continuing injury from both events. The jury was free to consider the emotional damages attributable to both claims. *See Grindle*, 665 F.3d at 799.

excessive force claim); *O'Neil v. Krzeminski*, 839 F.2d 9 (2d Cir. 1988) (awarding $80,000 in compensatory damages for excessive force where a pretrial detainee sustained soft tissue injuries and a fractured nose that resolved). Although these cases are not directly on point either, they at least show a range from which the jury here could reasonably conclude the $80,000 damage award properly compensated Williams for his physical and mental injuries. Considering the range of verdicts and the unique circumstances that this case presents, $80,000 is not irrational or unreasonable. The jury's award is rationally connected to the presentation of evidence at trial and falls squarely within the range of outcomes listed above. The Court declines to remit the award or grant a new trial because of the lack of evidence on damages. There is ample evidence to suggest that $80,000 award was justified.

**b. Closing Statements**

Defendants next argue that the award should be reduced or set aside because Williams' counsel allegedly made improper statements during closing argument. Defendants believe counsel's statements were tantamount to a "send a message" argument which would be improper as punitive damages were not at issue. *See Case v. Town of Cicero*, No. 10 C 7392, 2013 WL 5645780, at *10 (N.D. Ill. Oct. 16, 2013) ("The municipality may be liable for any compensatory damages Plaintiffs recover against the officers, but requesting a jury to 'send a message' does not apply to compensatory damages."); *Betts v. City of Chicago*, 784 F. Supp. 2d 1020, 1033 (N.D. Ill. 2011) ("Given that compensatory damages are limited to actual losses, this court agrees that [the plaintiff]'s argument that the jury should 'send a message' is a punitive damages argument"). But Defendants did not have the benefit of the trial transcript when they drafted their brief. And it appears Defendants' memory has failed them. Based on the transcript, Williams' counsel made no such argument. And, in any event, Defendants waived this argument by not objecting at trial.

"Counsel for the defense cannot as a rule remain silent, interpose no objections, and after a verdict has been returned seize for the first time on the point that comments to the jury were improper and prejudicial." *Carmel v. Clapp & Eisenberg, P.C.*, 960 F.2d 698, 704 (7th Cir. 1992) (quoting *United States v. Socony-Vacuum Oil Co.*, 310 U.S. 150, 238-39, 60 S. Ct. 811, 84 L. Ed. 1129 (1940)); *see also Smith v. Rosebud Farm, Inc.*, 898 F.3d 747, 753 (7th Cir. 2018) (holding that a party waived any argument over improper closing statements when counsel failed to object). "This rule enables a trial judge to make any necessary curative instructions." *Holmes v. Elgin, J. & E. Ry.,* 18 F.3d 1393, 1398 (7th Cir. 1994).

Defendants rely on *Spinnenweber v. Laducer*, 2019 WL 2591017 (N.D. Ind. June 24, 2019), *aff'd,* 983 F.3d 301 (7th Cir. 2020), in which the court found remittitur or a new trial proper even where defense counsel failed to object to closing statements. But *Spinnenweber* is distinguishable. Although the Court found that the plaintiff's "send a message" argument was inappropriate absent a claim of punitive damages, most of that case focused on the evidence at trial. *Id*. at *2. Importantly, the court found that "there is no rational connection between the scant evidence presented and compensatory award of one million dollars." *Id.* at *4. The Court has found the opposite here. *See McNabola v. Chicago Transit Auth.,* 10 F.3d 501, 516 (7th Cir.1993) ("[T]he verdict must stand unless there is no rational connection between the evidence and the jury's award.").

Defense counsel sat silently as William's counsel went through his closing arguments and gambled on the fact that the jury would return a favorable verdict. "Risky gambling tactics such as this are usually binding on the gambler." *Gonzalez v. Volvo of Am. Corp.,* 752 F.2d 295, 298 (7th Cir. 1985). Nobody prevented them from objecting; they could have done so outside the presence of the jury if that was a concern. And Defendants could have requested a curative

instruction—the typical remedy—but did not. *See Chlopek*, 499 F.3d at 702 (noting the "strong presumption" that the jury will follow instructions). Defendants gambled with the jury at trial, so this argument is waived today.

Even if Defendants did not waive their argument at closing for the purposes of seeking a new trial (they did), they grossly mischaracterize the substance of the argument. Nothing appears improper about counsel's statements. Williams' counsel did not—as Defendants suggest—tell the jury that they had "the opportunity to see that this would not occur again." (ECF No. 94 at 9). The Court has scoured the trial transcript and found no such argument in Williams' closing. It is worth highlighting what was actually said rather than the parties' recollections.

Williams' counsel, after discussing the jury instruction on damages, urged the jury to determine whether this case was a small claim or a big claim:

> I've never thought that instruction was necessarily very helpful, but it is your discretion. And I want to suggest to you the first question you need to ask is this a big important claim or is it a small claim? Because I want to suggest to you if it's a small claim, you know, you're probably not going to award anything more than $50,000.
>
> But if it's a bigger claim, if it's more important and more impactful, then you have to use your common sense.
>
> You know, I asked a question in voir dire. I said, would anybody have trouble with awarding $300,000. Please know I asked that question because some people say I can't give money for mental suffering or whatever it happens to be, so it's kind of a broad question.
>
> I'm not telling you that should be the number, but I am suggesting and I will here in a minute suggest that it needs to be substantial, because the injury was substantial. And the right that was violated was important.

(Trial Tr. 3 at 89).

It bears mentioning that the jury was instructed that closing arguments were not evidence. And statements that Williams was there to obtain "justice," that Williams' injuries were

13

"substantial," and that his rights were "important" do not appear to suggest that the jury should "send a message" to the City or other officers. And Williams' counsel did not urge the jury to award a verdict a range of $50,000-$300,000. Counsel was clear that the jury should "use their common sense" to answer this "broad question" and that he was not telling the jury what their verdict should be. To that end, the Court cannot say that the $80,000 award was the product of "passion and prejudice" or that the statements pushed the jury to an irrational verdict. *See Adams*, 798 F.3d at 543.

This is all the more true considering that both sides were explicit that Williams was not seeking punitive damages after those statements were made. Defense counsel during closing argument repeatedly stated that they could not use damages as a vehicle to "punish" either Defendant. (Trial Tr. 3 at 104-05, 106, 108). And on rebuttal, Williams' counsel was clear: "We're not making a claim for punitive damages…[s]o that's not an issue." (*Id.* at 110). Not only did Defendants waive their argument, the Court sees no avenue for Defendants to argue that Williams' counsel made a "send a message" argument. Nor did any arguments lead to an irrational verdict based on entire record here.

### c. State and Federal False Arrest Claims are Duplicative.

Defendants argue that the jury's awards for false arrest under state and federal law are duplicative and constitute double recovery. (ECF No. 94 at 11). On Verdict Form No. 1 for Williams' federal false arrest claim, the jury found in Williams' favor and awarded $20,000 in compensatory damages against Ballinger. (ECF No. 86). On Verdict Form No. 2 for Williams' state false arrest claim, the jury found the same and awarded $20,000 against the City. (*Id.*). Both the federal and the state-law claims arise from the same facts and seek identical relief. The verdict thus contains manifest errors of law. *See Duran v. Town of Cicero*, 653 F.3d 632, 642 (7th Cir.

2011) ("A judgment that can be read to allow a plaintiff to recover twice for the same injury contains a manifest error of law.").

Williams' federal false arrest claim—under 42 U.S.C. § 1983—does not provide for vicarious liability. *See Swanigan v. City of Chicago*, 881 F.3d 577, 581 (7th Cir. 2018) ("Federal common law prevents § 1983 plaintiffs from recovering twice for the same injury."). Williams' false arrest claim under Indiana law, however, does allow for vicarious liability against the City. *See Cox v. Evansville Police Dep't*, 107 N.E.3d 453 (Ind. 2018) ("the city benefits from the lawful exercise of police power so, when tortious abuse of that power naturally or predictably flows from employment activities, the city equitably bears the cost of the victim's loss"). The Court allowed Williams to proceed on both claims because they can be alternatively pled, and the jury received instructions regarding these theories:

> Defendant Boyce Ballinger is being sued as an individual under federal law. Such federal claims for civil rights violations are against Defendant Boyce Ballinger solely. You should decide each civil rights claim including false arrest and the use of excessive force only as to Defendant Boyce J. Ballinger.
>
> Plaintiff has also filed claims under Indiana state law that include a claim for the vicarious liability of the City of Fort Wayne for the acts of Defendant Boyce Ballinger in his capacity as a Fort Wayne Police Department employee.

(ECF No. 22 at 23). This instruction accurately reflects the law.

Even still, "[t]he doctrine of double recovery dictates that 'in the absence of punitive damages a plaintiff can recover no more than the loss actually suffered.'" *Medina v. District of Columbia*, 643 F.3d 323, 326 (D.C. Cir. 2011) (citation and quotation omitted). Underlying the doctrine is the principle that "when a plaintiff seeks compensation for wrongs committed against him, he should be made whole for his injuries, not enriched." *Id.* In practice, that means a party may not recover the same damages twice although recovery may be based on two separate theories.

15

*Id.* And where "a federal claim and a state claim arise from the same operative facts, and seek identical relief, an award of damages under both theories will constitute double recovery." *Id.*

There is no doubt that the federal false arrest claim and the state false arrest claim arise from the same operative facts—Ballinger's use of force to arrest Williams. The claims also sought identical relief—compensation for Williams' physical injuries, emotional distress, and mental suffering. Williams concedes that "of all the arguments made by Defendants, this is the only one which could result in some adjustment." (ECF No. 105 at 21). But Williams does not concede that a reduction or new trial "is an automatic remedy[,]" and posits that the $40,000 award for wrongful arrest "is not out of line with other similar cases." (*Id.* at 22). And indeed the "jury is not prohibited from allocating a single damages award between two distinct theories of liability." *Medina,* 643 F.3d at 326 (citing *Indu Craft, Inc. v. Bank of Baroda*, 47 F.3d 490, 497 (2d Cir. 1995)).

To that end, this Court is tasked with determining whether the jury intended to award Williams $40,000 for his injuries regarding his wrongful arrest claim. *Medina* addressed a similar situation. In that case, the jury awarded Medina $90,000 for a claim arising under D.C. law and $90,000 for a claim under Section 1983. *Id.* at 326. The court found that those claims arose under the same facts and sought recovery for the same injuries. *Id.* at 326-29. After that finding, the court stated that "Medina can prevail under these facts only if the jury intended to award him $180,000 for a single injury and allocated that amount between Medina's two theories of liability." *Id.* at 328-29. The magistrate judge in *Medina* explicitly instructed the jury not to concern itself with double recovery because he concluded that Medina could proceed on both the D.C. and federal law claims. *Id.* at 329. The D.C. Circuit reasoned that, in light of such an instruction, "we cannot presume the jury intended to compensate Medina $180,000 for a single injury without regard to the multiplicity of theories pled." *Id.* The *Medina* court found that the award amounted to

16

impermissible double recovery and remanded the case with instructions to require Medina to either accept a remittitur of $90,000 or, in the alternative, a new trial. *Id.* at 329-30.

A similar result is warranted here. Although this Court did not explicitly tell the jury not to concern itself with double recovery, the jury was instructed that Williams was proceeding on both state and federal theories. There is no indication that the jury intended Williams to recover twice for the same injury. *See id.* at 329. "It is just as plausible the jury intended to apportion a single damages award between both [Indiana] law and federal law theories." *Id.* Because the jury was instructed that Williams was proceeding under both theories, it is more likely that the $40,000 for Williams' false arrest claims constitutes double recovery. Although we cannot see into the mind of the jury, the Indiana law and the federal law claims arose under the same set of facts and sought to redress the same injuries. Without any indication otherwise, the Court is confident that the jury intended to award Williams $20,000 for his injuries stemming from Ballinger's wrongful arrest. Remittitur on this basis is appropriate.

### IV. Conclusion

For these reasons, the Court hereby GRANTS the Motion for a New Trial and/or to Amend Judgment (ECF No. 93) and ORDERS that Plaintiff has until October 29, 2024, to accept a reduction of the damages award to $60,000. In the event the remittitur is not accepted, the matter will be set for a new trial on Williams' false arrest claims.

Plaintiff's Verified Petition for Attorneys' Fees and Costs (ECF No. 90) will remain UNDER ADVISEMENT until Plaintiff either accepts the remittitur or the matter is set for a new trial.

SO ORDERED on October 23, 2024.

                                                  s/ *Holly A. Brady*
                                                  CHIEF JUDGE HOLLY A. BRADY

UNITED STATES DISTRICT COURT